

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VISION CHURCH, UNITED METHODIST, )<br><br>Plaintiff, )<br><br>v. )<br><br>VILLAGE OF LONG GROVE, )<br><br>Defendant. ) | Case No. 03 C 5761<br><br>HONORABLE CHARLES R. NORGLE |

## OPINION AND ORDER

CHARLES R. NORGLE, Sr., District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to

Federal Rule of Civil Procedure 56(c). For the following reasons, Defendant's Motion for

Summary Judgment is granted.

## I. BACKGROUND[1]

### A. Facts

The voluminous record in this case arises out of a dispute between Plaintiff Vision

Church ("Vision") and the Village of Long Grove (the "Village") over the development of real

property. Vision is an Illinois not-for-profit religious organization, with its principal place of

business in Mundelein, Illinois. The church's congregation is composed of mainly "American

born Chinese." See http://www.visionchurch.org/aboutus/aboutuschurchhis.html (visited

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and
notes disputed facts within the text.

1

9/30/2005). As of December 2000, Vision asserted that its then-current congregation consisted of 140 adults and 80 youths and children. Vision estimated that by 2010, the congregation would grow to 1,000 adults and 500 children. The Village of Long Grove is located on 18 square miles in Lake County, Illinois, and has a population of approximately 6,735. See http://www.longgrove.net (visited 9/30/2005).

### 1. Vision's 2001 Annexation Petition

In 1999, the Village Board of Trustees adopted and ratified a Comprehensive Plan which established certain fundamental goals and policies for land use within the Village limits. According to the Comprehensive Plan, essential to the Village's planning goals are the provisions for a quiet countryside, with an unhurried and unstructured environment where families can live in and enjoy open space. The Village has used the Comprehensive Plan as a guideline when it drafted its Zoning Code, and in make various zoning decisions, such as the approval of annexations and residential developments.

Also in 1999, Vision, which was then located in Park Ridge, began to look for a new site to build its church complex. Initially, Vision sought a 10 acre parcel of land. When it was unable to locate a tract suitable for its use, Vision entered into an agreement on July 29, 1999 to purchase a 27.4 acre vacant piece of land located in unincorporated Lake County. The contract contained a "zoning contingency clause," which enabled Vision to terminate the contract if it did not obtain zoning approval from Lake County within 180 days (January 2000) of entering into the agreement. In October 1999, upon Vision's request, the sellers agreed to amend the zoning contingency, and extended the termination date until May 31, 2000.

In June 2000, Vision filed an application for voluntary annexation with the Village

2

pursuant to 65 ILL. COMP. STAT. 5/7-1-8. The application was conditioned on two results: that the Village (1) zone the property Residential, and (2) grant Vision a Special Use Permit. Vision's proposal included a 99,000 square-foot complex of five buildings, including a 1,000 seat sanctuary, and several smaller buildings.

Because Vision did not file its annexation petition by May 31, 2000, it did not exercise the termination clause under the contract. In September 2000, Vision eventually closed on the purchase of the property. As of that date, Vision had not applied to Lake County for approval to build a church complex on the property, and its voluntary annexation petition with the Village had not been granted. At the time of the closing, the 27.4 acre property was thus not located within the village limits, and as a result, the Village did not have the authority to zone the land or take action on any development plan under the Village's Zoning Code.

Consistent with the 1999 Comprehensive Plan, in June 2000, the land within the Village was divided into residential, business, office and research, and open space districts. Within these districts, the Zoning Code provided for Planned Unit Developments ("PUDs") as special uses. The majority of the Village is zoned either residential or approved PUD. Churches were classified as a "special use." In order to obtain approval as a "special use" an applicant must: (1) be in a zoning district where the use was allowed as a special use (i.e., churches in a residential district), and (2) meet the standards set forth in the Zoning Code. The specific standards in the Zoning Code did not specify any minimum or maximum square foot requirement for a proposed building.

Special Use applications are initially brought before the Village Plan Commission. The Plan Commission is an advisory board that is responsible for conducting hearings and making

3

recommendations in regard to certain land use decisions, including Special Use applications. After a public hearing, the Plan Commission makes a recommendation on the Special Use application to the Board. The Board has the final approval of a Special Use Application.

In March 2001, after lengthy negotiations, Vision presented the Village a revised proposal, seeking a 59,000 square-foot complex with three main buildings, including a 600 seat sanctuary, an administration building, and a Sunday school building. Then, on April 3, 2001, at a Plan Commission meeting, Vision orally agreed to various pre-development conditions on their parcel. At the end of the April 3 meeting, the Village claims that the Plan Commission wanted more information on Vision's plan, and asked the church to submit a revised set of drawings that would: (1) reflect revisions consistent with the changes Vision agreed to, and (2) provide more detail regarding Vision's proposal. According to the Village, Vision never provided the Plan Commission with these materials. Vision, on the other hand, contends that the Plan Commission never requested a set of revised drawings.

On July 6, 2001, Vision's counsel informed the Village that Vision had chosen to rest on its application as presently submitted, and requested a vote on the pending application for annexation. Granting the request, a vote was scheduled on Vision's annexation petition for August 7, 2001. According to the Village, on August 6, Vision's counsel rejected several of the proposed conditions set forth by the Village, including the Village's request that Vision promise no future expansion if the Village approved a 59,000 square-foot facility. Such a restriction on grown is known as a conservancy easement. The next day, the Plan Commission recommended the denial of Vision's application. Vision alleges that it agreed to limit future expansion, but did not want a conservancy easement because it wanted to reserve certain open space on the property

4

as a play area for children.  On August 14, the Board voted to accept the Plan Commission's recommendation, and formally declined to voluntarily annex the property.

### 2. The Valenti Property

In May 2001, Joseph Valenti ("Valenti"), a developer who owned land adjacent to Vision's parcel filed an application to have his 120-acre property annexed to the Village and approved as a residential PUD.  On August 7, 2001, the same day as Vision's public hearing, the Plan Commission conducted a public hearing on Valenti's property.  Then, at the September 4, 2001 meeting, the Plan Commission voted to recommend the voluntary annexation of the Valenti Property.  On September 25, 2001, the Board voted 4-3 to approve the Valenti PUD, and on October 9, approved the annexation of the Valenti Property.  As a result of this annexation, Vision's property became completely surrounded by land located within the Village boundaries. Under Illinois law, the Village could then involuntarily annex Vision's property without having to accept the conditions of rezoning and a special use permit that Vision had insisted upon when it sought voluntary annexation.  See 65 ILL. COMP. STAT. 5/7-1-13.  Eventually, on October 23, 2001, the Village involuntarily annexed Vision's property.  At the time the Village annexed the property, it was aware that Vision had applied to Lake County for approval of a plan.  This County plan was bigger than Vision's March 2001 plan, which the Village rejected: the 59,000 square foot complex contained three main buildings and other smaller buildings.

According to the Village, the Valenti Property was annexed because Valenti's voluntary annexation petition and PUD proposal complied with the Village's zoning ordinance, land use goals and objectives set forth in the Comprehensive Plan.  However, Vision claims that the Village rushed to annex the Valenti Property in order to involuntary annex Vision's land, and

5

subject the church to the Village's zoning rules. Valenti's application was filed in May 2001, and approved by the Board in October, 2001. Vision does not claim any procedural improprieties.

### 3. The Public Assembly Ordinance and Denial of Vision's 2002 Application

In November 2001, Village Manager Cal Doughty ("Doughty") recommended to the Village Board that it consider a comprehensive amendment, the "Public Assembly Ordinance," to the Village Zoning Code for the location of, and standards for, "Public Assembly Uses," such as religious institutions, private schools, meeting halls, and clubs. On November 12, an initial draft of this Ordinance was presented to the Village President and Board. The Village contends that the Ordinance applies to all public assembly uses regardless of their religious or secular nature, and regardless of the speech conducted within these buildings. On April 9, 2002, the Board voted to enact the Ordinance.

As enacted, the Ordinance regulates the maximum number of square feet for public assembly buildings, and the maximum total volume of these buildings. See Am. Compl., Ex. F. The maximum square-footage and volume is dependant upon the size of the land on which the project is located, and the type of roadway it fronts. For example, public use buildings may only front state highways. Id. The Village asserts that this correlation between highway access and building size is based upon the planning principle that a state highway can accommodate more cars, people, and a larger complex. Vision, however, asserts that in the Village there is no rational distinction between State of Illinois and Lake County roads for purposes of servicing public facilities.

On January 23, 2002, two months after the Public Assembly Ordinance was proposed and

6

under consideration by the Village, Vision applied for a special use permit to allow construction of a church complex on their property. In response to an inquiry made by the Village Manager regarding the new proposal, Vision's counsel stated that Vision was unwilling to restrict the use of certain open areas, and future construction on the site. On June 18, 2002, Vision presented a plan for an 80,000 square-foot proposal, but asked the Plan Commission to vote on the 99,000 square-foot plan. The Plan Commission recommended that the Board deny the application, and the Board accepted the recommendation and formally denied the special use application. Vision's 2002 application did not comply with the criteria set forth in the Public Assembly Ordinance, which required a complex like Vision's to have a maximum area of 55,000 square-feet. The Village claims that their denial of the special use application was not based on religion, but solely because Vision did not comply with the Public Assembly Ordinance. As of this date, Vision has not built a church complex on its property.

**B. Procedural History**

The Plaintiffs did not seek relief in the state court of the denial of its Special Use Application. In the federal court, Vision filed its original Complaint on August 18, 2003, and its Amended Complaint on January 14, 2005, alleging, *inter alia*, violations of the Free Exercise and Establishment Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). United Methodist ("Methodist") is also a party to this suit, and Vision alleges no discrimination against Methodist by the Village. On February 8, 2005, the court denied Vision's Motion to Compel the depositions of various Village managers. See <u>Vision Church v. Vil. of Long Grove</u>, 226 F.R.D 323 (N.D. Ill. 2005). Then, on March 9, the Village and Vision filed

7

cross Motions for Summary Judgment. Vision seeks Summary Judgment on Counts 1, 2, 4, 5, 6, 8, 10, and 11, and the Village seeks summary judgment on the entire Complaint. Both parties filed their Responses on June 8, 2005, and Replies on July 15, 2005. The Village's Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between

8

reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

## B. Vision's First Amendment Claims[2]

### 1. Vision's Establishment Clause Claim

The first clause of the First Amendment to the Constitution provides that "[C]ongress shall make no law respecting an establishment of religion." CONST. AMEND. 1. This is commonly known as the Establishment Clause. The Establishment Clause requires the government to remain neutral with respect to religion, religious beliefs, and practice. "When the government acts with the ostensible and predominant purpose of advancing religion, it violates the central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." McCreary County, Kentucky v. Amer. Civil Liberties Union of Kentucky, 125 S. Ct. 2722, 2733 (2005). The Establishment Clause

---

[2]Count VII is styled "First Amendment: Exclusion." There is no "exclusion" clause in the First Amendment, and therefore the court grants summary judgment on this Count.

9

"prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" County of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 594 (1989) (quoting Lynch v. Donnelly, 465 U.S. 668, 687 (1984)). The Supreme Court has stated that the Establishment Clause means "that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." Id. at 590-91.

When a court considers "whether a state action violates the Establishment Clause it must consider: (1) whether the government activity in question has a secular purpose, (2) whether the activity's primary effect advances or inhibits religion, and (3) whether the government activity fosters an excessive entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971); Mercier v. Fraternal Order of Eagles, 395 F.3d 693, 704 (7th Cir. 2005) (quoting Books v. City of Elkhart, 235 F.3d 292, 301 (7th Cir. 2000)). Furthermore, "the Supreme Court has emphasized the case-by-case nature of a court's review of an alleged Establishment Clause violation." Id. at 702 (citing Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 315 (2000)); see Van Orden v. Perry, 125 S. Ct. 2854, 2860 (2005) (pointing out that the Court has selectively applied the Lemon test to Establishment Clause claims over the past 25 years)). At it's very core, the Establishment Clause requires that government remain neutral towards religion. Id. (citing Cutter v. Wilkinson, 125 S. Ct. 2113, 2121 (2005)). With these principles in mind, we turn to Vision's Establishment Clause claim.

10

First, there is no genuine issue of material fact as to whether the Village's Public Assembly Ordinance has a secular purpose. See Lemon, 403 U.S. at 612. The Ordinance is secular in purpose because it merely controls development, and not Vision's religious activities. While the Village's stated purpose for the Ordinance is to enforce zoning regulations, Vision does not offer evidence to rebut the Village's claim that its intent to enact the statute was driven by religious animus. The mere temporal proximity between Vision's involuntary annexation and the passage of the Public Assembly Ordinance does not create a genuine issue of material fact as to the Village's intent for enacting the law. "Although a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." McCreary County, 125 S. Ct. at 2735. There is no evidence in the record to suggest that the Village, through the enactment of the Public Assembly Ordinance, has endorsed a specific religion, that the Village's stated reasons are disingenuous, or give the impression that one religion is favored or preferred. See County of Allegheny, 492 U.S. at 593.

Second, the primary effect of the Ordinance is to regulate where and how certain public use facilities may be constructed in the Village. It neither advances one religion, nor inhibits Vision's members from practicing theirs. There are no religious overtones to the Ordinance. Third, there is no genuine issue of material fact as to whether there is excessive entanglement between the government and religion as a result of this Ordinance. The Village is not involved in every step of the building process, nor are there any regulations on religious activity. According to the Village, the goal of the Ordinance was to "advance its zoning and land use goals, not to inhibit the practice of religion in the Village." Def.'s Mot. for Summ. J., at 21.

11

There is no evidence in the record to suggest that the Village has affiliated itself with one religion, and thereby taking sides against Vision. See County of Allegheny, 492 U.S. at 593. In fact, the Public Assembly Ordinance is generally applicable to all religious and nonreligious entities. The Ordinance effects all groups, regardless of religious or political affiliation. See Lemon, 403 U.S. at 612. The Public Assembly Ordinance has a secular purpose, it neither advance or inhibits one religion at the expense of another, nor does the Ordinance create excessive entanglement between the Village and Vision. As a result, there is no genuine issue of material fact as to whether the Village, through the passage of the Public Assembly Ordinance, has violated the Establishment Clause, and summary judgment is therefore appropriate for the Village as to Vision's Establishment Clause claim. See Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 765-766 (7th Cir. 2003) (generally applicable zoning ordinance did not violate First Amendment, where regulation was motivated by legitimate considerations involving land use and placed churches on equal footing with nonreligious assembly uses).

### 2. Vision's Free Exercise Claim

The second clause of the First Amendment provides that "Congress shall make no law. . . which prohibits the free exercise of religion." CONST. AMEND. 1. "The protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Church of the Lukumi Babalu Aye v. City of Hialeh, 508 U.S. 520, 532 (1993). Government action "that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." Id. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." Id.; see McCreary County, 125 S. Ct.

12

at 2735; U.S. v. Indianapolis Baptist Temple, 224 F.3d 627, 629 (7th Cir. 2000). "The Free Exercise Clause. . . does not afford an individual the right to dictate the conduct of the Government's internal procedures." Johanns v. Livestock Marketing Ass'n, 125 S. Ct. 2055, 2064 (2005) (quoting Bowen v. Roy, 476 U.S. 693, 700 (1986)).

"The touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and religion and non-religion." Id. (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)). The Seventh Circuit instructs us that "in the context of the Free Exercise Clause, [plaintiff] must first establish that his right to practice [religion] was burdened in a significant way." Kaufman v. McCaughtry, 419 F.3d 678, 683 (7th Cir. 2005). With these principles in mind, we turn to Vision's Free Exercise Claim.

Under a Free Exercise analysis, Vision's right to practice religion has not been significantly burdened. See Kaufman, 419 F.3d at 683. While a governmental body is afforded great deference in their zoning regulations, they cannot cloak themselves in the shroud of legitimacy to discriminate on the basis of religion, and avoid constitutional scrutiny. The Village must be mindful that the "First Amendment mandates governmental neutrality between religion and religion, and religion and non-religion." Kaufman, 419 F.3d at 683. Here, the only prohibition imposed on Vision is a restriction on the physical size of the proposed buildings. There is no restriction on Vision's beliefs or customs. The Village is not required to abandon its zoning regulations and growth concerns to satisfy a single religious entity's desire for unmitigated development, any more than Vision can "dictate a Government's internal procedures." Johanns, 125 S. Ct. at 2064.

13

It is reasonable to say that a church with a congregation of 140 adults and 80 children is not "significantly burdened" in this case for purposes of the First Amendment. See Kaufman, 419 F.3d at 683. A church that is 55,000 square feet has ample space to house a congregation of 140 adults and 80 children comfortably. This is not a situation where the Village has restricted Vision to a one room building where all the members must stand shoulder to shoulder in order to pray. The maximum square footage allowed by the Village does not constitute a significant burden on religion for First Amendment purposes.

Additionally, the court notes that the Village has remained neutral as to all religious groups within its borders. The Public Assembly Ordinance does not distinguish between religions, it merely classifies between neighborhood, community, and regional facilities. See Am. Compl., Ex. F. "The minimum requirement of neutrality is that a law not discriminate on its face." Church of the Lukumi Babalu Aye, 508 U.S. at 533. Here, the Village has satisfied this requirement, and not run afoul of the First Amendment. There are no words with religious meanings, such as "sacrifice," and "ritual" that would make the Ordinance fail the test of neutrality. See id. As noted previously, the Village has in no way prohibited Vision from practicing its religion. It has only restricted the size and structure of its physical house of worship. Such a restriction is fully within the right of a municipality. See Civil Liberties for Urban Believers, 342 F.3d at 761. Generally speaking, "a zoning ordinance imposing 'restrictions in respect of the use and occupation of private lands in urban communities' such as the 'segregation of residential, business, and industrial buildings' satisfies the rational basis tests as a 'valid exercise of authority.'" Id. at 766. Therefore, Vision has not introduced any evidence as to the Village's intent, or that it has not remained neutral as to Vision's religious beliefs. As a

14

result, summary judgment is appropriate for the Village as to Vision's Free Exercise claim. <u>See</u>

<u>id.</u>

**C. Vision's RLUIPA Claims**

### *1. Vision has not suffered a "substantial burden" for purposes of the RLUIPA*

The RLUIPA states, in part:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –
>> (A) is in furtherance of a compelling governmental interest; and
>> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). The Act "defines 'religious exercise' to include 'any exercise of

religion, whether or not compelled by, or central to, a system of religious belief.'" <u>Cutter,</u> 125 S.

Ct. at 2118 (citing § 2000cc-5(7)(A)). The RLUIPA "was passed after the Supreme Court's

decision in <u>City of Boerne v. Flores,</u> 521 U.S. 507 (1997), which invalidated the Religious

Freedom Restoration Act ("RFRA") of 1993." <u>Sts. Constantine and Helen Greek Orthodox</u>

<u>Church, Inc. v. City of New Berlin,</u> 396 F.3d 895, 897 (7th Cir. 2005). "The drafters of the

RLUIPA sought to avoid RFRA's fate by limiting the scope of the new Act to (1) state

regulations (statutory or administrative) that affect commerce, (2) programs that receive federal

financial assistance, and (3) programs under which the agency makes 'individualized assessments

of the proposed uses for the property involved.'" <u>Id.</u> Furthermore, "the RLUIPA is not

unconstitutional on its face, in all possible applications." <u>Id.</u> (citing <u>Charles v. Verhagen,</u> 348

F.3d 601, 610-11 (7th Cir. 2003)). The RLUIPA "forbids government to 'impose or implement a

land use regulation in a manner that treats a religious assembly or institution on less than equal

15

terms with a non religious assembly or institution.'" Id (quoting 42 U.S.C. § 2000cc(b)(1)).

"The substantial burden provision . . . must mean something different from great burden than imposed on secular institutions." Id. Finally, if a "land-use decision . . . imposes a substantial burden on religious exercise . . . and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision." Id.

The Village admits that the RLUIPA is applicable to the denial of Vision's 2002 Special Use application. However, Vision did not incur a "substantial burden" for purposes of the RLUIPA. Under the Village's Public Assembly Ordinance, Vision would have been able to build a 55,000 square-foot facility on the property. Ultimately, it was Vision, not the Village that made the final determination not to build the church and surrounding buildings. Vision refused to comply with the Village's zoning standards, and failed to submit an application that complied with the Public Assembly Ordinance. The RLUIPA does not guarantee that a religious organization may build a complex as large as that organization desires. A municipality can control growth and expansion within its city limits. Limiting Vision's development did not "substantially burden" the church in the practice of its religion. It simply placed limitations on the size of a church that could be built on the 27.4 acre parcel.

Vision alleges that it was "substantially burdened" within the meaning of the RLUIPA when the Village exercised its discretion to impose over fifty conditions on Vision. Specifically, Vision claims it has paid over half a million dollars in fees and expenses during the Special Use application process. Vision argues the actions undertaken by the Village were done to frustrate the proposed development of the church complex.

16

However, Vision has not shown how a congregation of 140 adults and 80 children are substantially burdened by having a 55,000 square-foot facility, instead of the requested 99,000 square foot complex. "Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise, including the use of property for religious purposes, would render meaningless the word 'substantial,' because the slightest obstacle to religious exercise incidental to the regulation of land use-however minor the burden it were to impose-could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means." Civil Liberties for Urban Believers, 342 F.3d at 761. The Village's Public Assembly Ordinance is only an obstacle for Vision in terms of the physical size of the church, not an obstacle to their religious exercise.

For purposes of the RLUIPA, "a land use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise-including the use of real property . . . impracticable." Id. Vision has not established a genuine issue of material fact as to how the church is substantially burdened because it cannot build a 99,000 square-foot facility, or that the Village's ordinance rendered any religious exercise on the property effectively impracticable. If Vision had complied with the 55,0000 square-foot requirement, there might be a church complex today. That Vision paid substantial fees and expenses, or was subjected to the same ordinance as other developers who wish to build in the Village, does not create a substantial burden for Vision. Presumably, other landowners who go before the Plan Commission spend money on attorneys' fees and other costs related to their petition. While Vision is not required to prove their case at the summary judgment stage, it must submit some evidence that creates a genuine issue of material fact, and

17

because this was not done, summary judgment is appropriate for the Village as to Vision's claim under §(a)(1) of the RLUIPA. See E.E.O.C. v. Sears, Roebuck & Co., 417 F.3d 789, 792 (7th Cir. 2005).

### 2. Vision has been treated on equal terms with non-religious entities

Section 2(b)(1) of the RLUIPA provides, in part, "[N]o government shall impose or implement a land use regulation in a manner that treats a religious assembly use or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. §2000cc(2)(b)(1). Moreover, § 2(b)(3)(A) states that no government shall impose a land regulation that "totally excludes religious assemblies from a jurisdiction." 42 U.S.C. § 2000cc2(b)(3)(A). Vision, however, has not identified a non-religious group that has received more favorable treatment. In fact, the Village is currently in litigation with another petitioner, a private school, who failed to comply with the Public Assembly Ordinance.[3] Additionally, the Public Assembly Ordinance did effect existing churches within the Village, as a result of the 11,000 square feet maximum space requirement for neighborhood public assembly uses. After the passage of the Ordinance, several of the existing churches in the Village were non-conforming. See Def.'s Resp. to Pl.'s Amend. Stmt. of Mat. Facts, ¶ 60; Def.'s Stmt. of Mat. Facts, ¶ 82. Therefore, for purposes of the RLUIPA, the Village has demonstrated that it does not apply the Ordinance only to religious institutions, but evenly to all petitioners that come before the Plan Commission.

Furthermore, the public school that Vision claims was excluded from the Ordinance was built in 1999, before the Public Assembly Ordinance was enacted. "The Government, 'no less

---

[3]That case, Montessori Peace School, et al v. Village of Long Grove, is currently in the circuit court of Lake County. Case No. 04 CH 525.

18

than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" <u>Jacobsen v. Ill. Dep't of Transportation</u>, 419 F.3d 642, 647 (7th Cir. 2005). As a result, Vision cannot show a genuine issue material fact as to a violation of § 2000cc2(b)(3)(A), and summary judgment is proper for the Village on Vision's RLUIPA Equal Protection Claims.

**D. Fourteenth Amendment: Equal Protection Claim**

Vision also claims that the Village violated the Equal Protection Clause of the Fourteenth Amendment when it passed the Public Assembly Ordinance. It is the established law in the Seventh Circuit that "absent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land use context, a plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives." <u>See</u> <u>Civil Liberties for Urban Believers</u>, 342 F.3d at 766. Furthermore, "unless a statute classifies by race, alienage, or national rights, 'the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" <u>Id.</u> (quoting <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 440 (1985)).

The first step in any Equal Protection Clause analysis is to identify whether the government has classified different groups, i.e, drawn a distinction among people. <u>See</u> <u>Personnel Adminstrator of Mass. v. Feeney</u>, 442 U.S. 256 (1979). Second, once the classification has been identified, the next step is to identify the level of scrutiny applied to the law. <u>See</u> <u>Martin v. Shawano-Gresham Sch. Dist.</u>, 295 F.3d 701, 712 (7th Cir. 2002). "Typically, an equal protection claim focuses on the denial of a fundamental right or disparate treatment of persons depending on the claimant's suspect classification." <u>Id.</u> These claims are examined under a more exacting

19

strict scrutiny test, while other equal protection claims are examined under the deferential rational basis test. Id.

The Public Assembly Ordinance does not classify on the basis of race, gender, or national origin. Nor does it classify on the basis of religion. The only distinction made in the Ordinance is between public assembly and private locations. See Am. Compl., Ex. F. Governments have wide discretion in the enactment of legislation that furthers economic growth of the community. "Social and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate government purpose." Hodel v. Indiana, 452 U.S. 314, 331-32 (1981).

Although Long Grove's Ordinances are facially valid, laws valid on their face may still violate the Constitution in their application. In the seminal case of Yick Wo v. Hopkins, Justice Matthews wrote,

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

118 U.S. 356, 373-74 (1886).

Vision asserts that the manner in which Long Grove has applied its Ordinances to Vision has resulted in Vision being treated differently from other similarly situated entities in Long Grove, and that Long Grove has no rational basis to explain this different treatment. Amended Compl., ¶¶ 28-32. Put another way, Vision's assertion is that it is a "class of one" whose Equal Protection rights under the United States Constitution have been violated. "[T]he Supreme Court

20

. . . declar[ed] that class of one equal protection claims are valid where 'the plaintiff alleges that she has been intentionally treated differently than others similarly situated and that there is no rational basis for the difference in treatment.'" Olech v. Village of Willowbrook, 528 U.S. 562, 564 (2000)).

To establish a prima facie case of "class of one" discrimination, Vision must "present evidence that [Long Grove] deliberately sought to deprive [Vision] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of [Long Grove's] position." Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000). Specifically, Vision must show that they were: "(1) intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," or (2) "that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." Nevel v. Vil. of Schaumburg, 297 F.3d 673, 681 (7th Cir. 2002).

First, Vision has submitted no evidence that could suggest that the Village treated it differently from other similarly situation institutions. In fact, Vision cannot show that others similarly situated as Vision have received preferential treatment. Vision merely claims that bar, restaurants, and taverns are not subjected to the Public Assembly Ordinance. See Am. Compl., ¶ 41. However, these uses were only allowed in the Village's business district, as opposed to the Residential district where Vision wishes to build. Second, there is no evidence that demonstrates that the government is treating other individuals who are virtually identical to Vision in a more lenient matter. See id. The evidence Vision has submitted is that it was denied a zoning permit to build a 56,000 square foot facility. There is nothing to indicate that the Village intentionally

treated Vision different from others, or that the Village's actions are wholly unrelated to a legitimate governmental objective. See Civil Liberties for Urban Believers, 342 F.3d at 766; see also Olech, 528 U.S. at 564. Vision was treated the same under the Ordinance as any other developer who would appear before the Plan Commission.

The Public Assembly Ordinance at issue in this case is equally applicable to all public assembly places, and does not discriminate against one group, as opposed to another. The Ordinance is rationally related to the stated government objectives. Specifically, the Village's stated planning goals are for a quiet countryside, with an unhurried environment where families can enjoy the open space. The Public Assembly Ordinance furthers that goal by limiting the size of certain buildings operated for public use, and through the designation of which facilities may be located on specific county or state highways. See Am. Compl., Ex. F. When an ordinance is facially neutral and generally applicable, as the Public Assembly Ordinance is here, the rational basis test is applied. See Civil Liberties for Urban Believers, 342 F.3d at 766. Strict scrutiny is reserved for statutes which deny a fundamental right or make distinctions among suspect classes, such as religion, race, or national origin. See Richmond v. J.A. Croson Co., 488 U.S. 469 (1989); see also Metro Broadcasting, Inc. v. F.C.C., 497 U.S. 547 (1990).

Vision has failed to establish a genuine issue of material fact as to whether they are being treated differently from others similarly situated. In its Amended Complaint, Vision claims that six churches in the Village have similar, or higher seating capacity per acre than Vision's proposed maximum density of 36 persons per acre. For example, out of the six diverse religious institutions within the Village, four of them have a higher density. Life on the Vine Christian Church had a density of 39.1 persons per acre, Congregation Beth Judea had 87.9 persons per

22

acre, Temple Chai had 105.1 persons per acre, and Long Grove Community Church had a density of 260 persons per acre. The purpose of the Public Assembly Ordinance was to "regulate the size of all new public assembly uses, including churches . . . and served the rational purpose of ensuring that new assembly uses were consistent with the Village's zoning goals." However, all of these structures were built prior to the Public Assembly Ordinance, and those building erected after the Ordinance was passed are subject to the Ordinance's regulations. See supra, note 3.

Additionally, two busy public schools are located across the street from Vision's land, on 75 acres, with a combined student and staff capacity of 1300 people. See Pl.'s Stmt. of Mat. Facts, ¶ 92-93, 96. The schools are combined onto one, 4.1 acre building, 172,000 square feet, with at 191,000 square foot parking lot. See Pl.'s Resp. at 19. However, both of these schools were built prior to the enactment of the Public Assembly Ordinance. Additionally, public schools serve a completely different function separate from churches, and the Village did not have zoning authority over the location and size of these schools. See Def.'s Stmt. of Mat. Facts, ¶ 82. One of the schools has filed a lawsuit in Lake County Circuit Court.

At its core, Vision's argument is that the denial to build a larger religious structure, somehow amounts to a violation of Vision's equal protection rights under the Fourteenth Amendment. However, "whatever the obstacles that the [Village] might present to a church's ability to locate on a specific plot of land, they in no way regulate the right, let alone interfere with the ability, of an individual to adhere to the central tenets of his religious beliefs." Civil Liberties for Urban Believers, 342 F.3d at 766. This is the most significant aspect of this case. The Village in no way prohibited Vision's members from practicing their religion. The limitations the Village placed on Vision's location "are not the regulation of a belief, any more

23

than regulating the location of the Chicago Tribune building is a regulation of the newspaper's First Amendment-protected product." Id. (quoting Civil Liberties for Urban Believers v. City of Chicago, 157 F. Supp.2d, 903, 908 (N.D. Ill. 2002). Here the Village allows any and all religious groups to build within its boundaries, provided that the religious groups adhere to the Village's zoning requirements. In the final analysis, the Village does not try to place restrictions on Vision's beliefs or their ability to practice its religion. Such a concern does not run afoul of the Constitution. Therefore, because Vision cannot establish a genuine issue of material fact as to whether the Village denied Vision its Fourteenth Amendment Equal Protection rights, summary judgment is proper for the Village as to Vision's Equal Protection claim.

**E. Vision's Vested Rights Claim**

Vision's Amended Complaint also contains a vested rights claim. Vision alleges that it acquired a vested right to build a church on the property after it sold its facility in Park Ridge in reliance on the Lake County Zoning Ordinance. See Am. Compl., ¶¶ 57-58. Under Illinois law, in order for a plaintiff to have vested rights to a zoning approval, that plaintiff must spend money in reliance on the probability that zoning approval will be forthcoming under the municipality's existing laws. See Northern Trust Co. v. County of Lake, 818 N.E.2d 389, 397 (Ill. App. Ct. 2004). A landowner's need for approval on the part of the municipality, such as the grant of a special use permit, defeats a vested rights claim. See id; see also Zeitz v. Vil. of Glenview, 710 N.E.2d 849, 855-56 (Ill. App. Ct. 1999).

When a property owner spends money or incurs obligations in "reliance on the probability that a building permit will be issued . . a vested right to obtain the permit may be acquired. . . even though the zoning classification of the property is subsequently changed to prohibit the

24

proposed use." Northern Trust, 818 N.E. 2d at 397. In order for a landowner to invoke this rule, he must show: "(1) that there was a 'probability' that [municipal approval] would issue, and (2) that a substantial change in position was incurred based upon this probability." Id. (citing Bank of Waukegan v. Vil. of Vernon Hills, 254 Ill. App.3d 24, 31 (1993)). Probability of municipal approval is established when the "property at issue is zoned to permit the use requested by the landowner." Id.

Vision challenges the county ordinance, alleging, "under the Lake County Zoning Code, a church was a permitted use, as of right, on the property." Am. Compl., ¶ 55. Therefore, it appears that Vision's Vested Rights cause of action is grounded in the Lake County Zoning Ordinance. "Vision was legally entitled to rely on the Lake County zoning of the Subject Property in their decision to purchase it . . . . Accordingly, Vision acquired a vested right to build a church on the Subject Property." Id., ¶¶ 56-57. However, Vision names only the Village in its suit.

Furthermore, Vision cannot establish that there was a probability of municipal approval to build a church complex on its property. When Vision bought the land, the contract included a contingency clause that allowed Vision to terminate the contract if it did not receive approval from the Village. See Def.'s Stmt. of Mat. Facts, ¶ 19, Ex. 7. Vision decided not to terminate the contract. Therefore, Vision cannot establish that there was a probability that the Village would have granted its application, when Vision itself is uncertain as to how the Village would decide the issue. As a result, there are no genuine issues of material facts as to Vision's Vested Rights claim and summary judgment is appropriate as to this count. See Szymanski, 231 F.3d at 364.

# F. Arbitrary and Capricious Denial of Special Use Permit

Vision also alleges that the Village's denial of the Special Use permit was arbitrary and capricious. Vision further alleges that the reasons given by the Village, such as the proposed use was not compatible with the surrounding neighborhood, and that Vision had a hidden agenda to create a super-church, were not a proper basis for the denial of a special use permit. See Compl., ¶ 52. Vision also seeks damages in excess of $10,000,000.00 for economic losses caused by the Village's actions.

Under the Illinois Tort Immunity Act, municipalities are immune from damages resulting from their legislative decisions. See 745 Ill. Comp. Stat. 10/2-104; see also Vil. of Bloomingdale v. CDG Enterprises, Inc., 752 N.E. 2d 1090, 1099-1100 (Ill. 2001) ("section 2-104 plainly grants immunity for injury caused by the 'denial of any permit' and is, therefore, controlling."). Therefore, Vision is barred from recovering damages against the Village for their official actions. There is no evidence that raises more than a mere scintilla of evidence to show a genuine triable issue of material fact on this matter. See Szymanski, 231 F.3d at 364; see also Vukadinovich, 278 F.3d at 699. As a result, summary judgment is appropriate as to Vision's Arbitrary and Capricious claim.

## III. CONCLUSION

As the Seventh Circuit reminds us, "[f]ederal courts are not boards of zoning appeals."

River Park, Inc. v. City of Highland Park, 23 F.3d 164, 165 (7th Cir. 1994). While Vision may

have received an unfavorable decision from the Village, this court will not review the Board's

ruling absent clear evidence of constitutional violations. For the foregoing reasons, the court

grants Defendant's Motion for Summary Judgment as to all counts.

IT IS SO ORDERED.

ENTER:

_Charles R. Norgle_

CHARLES RONALD NORGLE, SR. Judge

United States District Court

DATED: _10-7-05_

27